U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 26 2020

CLERK, U.S. DISTRICT COURT
By_____
             Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

KRIS EDWARD RAU,                    §
                                    §
          Petitioner,               §
                                    §
v.                                  §      No. 4:18-CV-1003-A
                                    §
BOBBY LUMPKIN, Director,[1]         §
Texas Department of Criminal        §
Justice, Correctional               §
Institutions Division,              §
                                    §
          Respondent.               §

### MEMORANDUM OPINION
### and
### ORDER

This is a petition for a writ of habeas corpus pursuant to
28 U.S.C. § 2254 filed by petitioner, Kris Edward Rau, a state
prisoner confined in the Correctional Institutions Division of
the Texas Department of Criminal Justice, against Bobby Lumpkin,
director of that division, respondent. After having considered
the pleadings, state court records, and relief sought by
petitioner, the court has concluded that the petition should be
denied.

### I. FACTUAL AND PROCEDURAL HISTORY

Petitioner was charged in Wise County, Texas, Case No.
CR17812, with murder in the shooting death of Lianne Allyson

---

[1]Bobby Lumpkin has replaced Lorie Davis as the director of the
Correctional Institutions Division of the Texas Department of Criminal
Justice. Thus, he is automatically substituted as the party respondent. Fed.
R. Civ. P. 25(d).

Murray. (Clerk's R., vol. 1, 7, doc. 17-5.) On June 19, 2015, a jury found petitioner guilty of the offense and assessed his punishment at life imprisonment and a $10,000 fine. (Id., vol. 4, 685, doc. 17-11.) Petitioner's conviction was affirmed on appeal and the Texas Court of Criminal Appeals refused his petition for discretionary review. (COA Docket Sheet 2, doc. 17-2.) Petitioner also sought post-conviction state habeas-corpus relief by challenging his conviction in a state application for a writ of habeas corpus, which was denied by the Texas Court of Criminal Appeals without written order. (SHR[2] 866-83, doc. 18-23; Action Taken, doc. 18-1.) This federal petition followed.

The state appellate court summarized the factual background of the case as follows:

> When she died on April 14, 2014, single mother Lianne Murray had two grown children, Allisyn Ramirez and Daniel Murray, was a grandmother of a young boy, and was eagerly awaiting the birth of her second grandson in May. Her father had committed suicide in April 2009 by shooting himself, and her mother had passed away a short time later, suffering from dementia and estranged from Lianne. Lianne and her sister, Robin White, had never gotten along and had quarreled over their parents' estate.
>
> Lianne had two homes: (1) a house and plant nursery on a thirteen-acre tract on Pine Island, Florida that she had inherited from her parents and (2) forty five acres in Wise County, Texas on which sat a steel building containing a garage and house.
>
> . . .

---

[2]"SHR" refers to the record of petitioner's state habeas proceeding in WR-89,017-01.

At the end of August 2013, Lianne was living in
Pine Island, Florida and met [petitioner] on Match.com.
Shortly thereafter, Lianne moved into the house
[petitioner] rented in Fort Myers, Florida. She and
[petitioner]'s sister, Kelly Rau, became friends, but
Lianne's children did not care for [petitioner], and he
knew it.

. . .

In late 2013, as was her custom, Lianne returned
to Texas temporarily to work as a home healthcare nurse
for a local agency, supplementing her income from the
nursery. At the time of her death, Lianne was working
full-time five nights a week in a home caring for a
severely handicapped child and working extra shifts in
other homes when possible. Lianne also remained
actively involved in the daily running of the nursery
in Florida even while she was in Texas, and she stayed
in constant contact with Allisyn, who worked at the
nursery along with her husband and Daniel.

[Petitioner] visited Lianne in Texas in December
2013 and spent much of his time and money improving the
Wise County property. Around Christmas, Lianne told her
children that she was going to permanently live in
Texas and [petitioner] was going to move to Texas to
live with her.

[Petitioner] quit his job in Florida and cashed in
his retirement account. He moved in with Lianne on
February 14, 2014.

. . .

On February 28, 2014, [petitioner] started working
as a welder in nearby Bridgeport, Texas. A week later,
he received his retirement proceeds in the amount of
$32,374.36 and quit his welding job. He deposited
approximately $29,000 in two separate accounts at a
local bank.

[Petitioner] put a lot of labor and money into
Lianne's Texas property: mowing; trimming trees;
building a 1,000-foot, four-board fence; and making
other repairs and improvements. He gave Lianne around
$6,000 to help her pay debts, including her son
Daniel's expenses, which [petitioner] greatly resented.

3

[Petitioner] also bought a tractor, a tiller, and a mower. On the day of Lianne's death, [petitioner] only had about $800 left in his two bank accounts.

. . .

Lianne planned to fly to Florida when Allisyn's second child was born in May 2014 and then drive back to Texas with Daniel, who would live with [petitioner] and Lianne temporarily while finding his own place and before beginning classes at the University of North Texas in the fall. On Saturday, April 12, 2014, Lianne texted Allisyn that she would soon be able to purchase her plane ticket to Florida. That same night, Lianne also told the mother of one of her patients that she would soon return to Florida.

. . .

On Sunday, April 13, 2014, the couple had a physically violent argument, and Lianne told [petitioner] to leave her home or she would call the police. The next day, April 14, 2014, sometime after Lianne returned from working her overnight shift, she died in the front yard of her Wise County home from a gunshot wound to her throat.

After Lianne's death but on the same day, [petitioner] left her Wise County home and drove to the home of his sister, Kelly, in Lee County, Florida. On the way, he disposed of his Glock .40 semiautomatic pistol.

. . .

When [petitioner] arrived at Kelly's home on April 15, 2014, he told her about Lianne's death, and she called 911 while he was in the shower.

At trial, Detective Jaime Nolan of the Lee County, Florida Sheriff's Office testified that on April 15, 2014, he and Detective Robert Patton responded to Kelly's 911 call and then brought [petitioner] to their office for an interview. Joshua Reynolds, an investigator for the Wise County, Texas Sheriff's Office, began an investigation on April 15, 2014 after receiving information from the Lee County, Florida Sheriff's Office that a possible homicide had taken

4

place in Wise County.

Investigator Reynolds visited Lianne's Wise County property and discovered her body wrapped in a blanket and plastic and lying in the garage. She had been shot under her chin, on the left side of her neck. After finding Lianne's body, Reynolds traveled to Florida to interview [petitioner]. [Petitioner] was interviewed on two separate days by Detectives Nolan and Patton, and Investigator Reynolds also interviewed him on the second day.

. . .

[Petitioner], who, by his own timeline, left Lianne's Wise County home less than an hour after finding her dead and drove straight to Lee County, Florida, stated in his interviews with law enforcement that Lianne had committed suicide by shooting herself with his pistol.

A Wise County grand jury indicted [petitioner] for murder on June 26, 2014, and he was confined in the Wise County jail pending his trial.

. . .

One of [petitioner]'s cellmates, William Wayne Cox, told law enforcement (and later the jury) that [petitioner] had confessed to murdering Lianne.

(Mem. Op. 2-6, doc. 17-3 (footnote omitted).)

In significantly more detail, the appellate court recounted the following in addressing the sufficiency of the evidence:

. For the majority of his interviews with law enforcement, [petitioner]'s theory was that Lianne had committed suicide. When Investigator Reynolds indicated to him that forensics did not support suicide, [petitioner] raised his voice and said that the neighbors or Lianne's children could have shot her. The State's theory was that [petitioner] killed Lianne soon after she arrived home from work, attempted to give himself an alibi by running several errands in different locales near the home, and destroyed or hid evidence to hide his culpability and promote

5

his suicide story.

   . . .

    Thirty-one people testified during the guilt-
innocence phase of trial, and the trial court admitted
almost 300 exhibits. [Petitioner] exercised his right
not to testify, but his recorded interviews with law
enforcement were admitted and played for the jury.

   . . .

    [Petitioner] acknowledged in his interviews with
law enforcement that he and Lianne, whom he described
as his girlfriend of six months, had a physical
altercation on Sunday, April 13, 2014, the night before
her death. He claimed that she had attacked him. He
then pushed her backwards against a wall and grabbed
her—hard enough to leave bruises the next day—"trying
to hold [her] so [he could] talk to [her]" or "trying
to get [her] to stop swinging and whaling at [him]."
When he let go, Lianne kicked him in the testicles and
went outside.

    [Petitioner]'s sister Kelly testified that
[petitioner] discussed the fight with her after
Lianne's death. Kelly's account differed slightly from
her brother's. She testified that [petitioner] told her
that after Lianne kicked him in the scrotum, he "held
her down on the ground . . . because she had said she
was done and she didn't stop."

    After their fight, Lianne called [petitioner] a
"wife-beater" and left early for her regular overnight
nursing shift. He reported that they spoke and texted
multiple times Sunday night, and cell phone records
show that eight calls were made that night from his
phone to hers, beginning at 8:02 p.m. In addition, she
texted him a message demanding that he leave her house
or she would call the police.

   . . .

    [Petitioner] initially told the Florida detectives
that by the time Lianne returned home from work around
9:00 or 9:10 a.m. on Monday, April 14, 2014, she was
still mad at him, but she wanted a hug and no longer
wanted him to leave. [Petitioner] stated that she told

him that she was going to take a tranquilizer, she did
take it as far as he knew, and then she showered and
went to sleep.

In his second interview with law enforcement,
[petitioner] remembered running some errands on the
morning of April 14, 2014, after Lianne went to sleep.
He told the Florida detectives that he went to:

- his bank in Lake Worth, Texas and closed
  his savings account;
- a Verizon store, about a mile away from
  the bank, where he paid his cell phone
  bill;
- a manufacturing business with a big
  banner seeking job applicants; and
- a motor sports business to buy an
  off-road vehicle permit.

. . .

[Petitioner] initially reported that he arrived
back home around 1:30 p.m. because at 2:00 p.m., he
answered on the house phone via Bluetooth a call from
Allisyn to Lianne's cell phone. Allisyn testified that
she called her mother at 1:54 p.m. and for the first
time ever, [petitioner] answered Lianne's phone. He
whispered, "[O]h, hey, sweetie, your mom's asleep.
You'll have to call her later." Allisyn testified that
Lianne worked nights, so her sleeping during the day
would not have been unusual.

Lisa Upton, a telecommunications analyst with the
Texas Department of Public Safety (DPS), testified at
trial that she performs cell phone mapping. Upton
claimed that none of the many calls placed to Lianne's
cell phone on April 14, 2014 after the 1:54 p.m. call
hit a tower. Upton explained that when calls go to
voice mail, a tower is not hit. Further, she testified
that calls go to voice mail when the phone is turned
off, not answered, or destroyed or when its battery is
dead.

Changing his initial story that he returned home
around 1:30 p.m., [petitioner] stated later in his
interviews that he must have arrived home closer to
12:30 p.m. because he was there when Lianne woke up at
1:00 p.m. to use the bathroom. [Petitioner] said that

7

he asked Lianne at that time if she had a postage
stamp, but she did not acknowledge him and went back to
bed.

According to [petitioner], Lianne got up again at
3:00 p.m., told him she was going back to bed, and
again went in the bathroom. [Petitioner] speculated
that she might have taken another pill because she was
"wobbly" and "her motor skills seemed funny" when she
left the bathroom. [Petitioner] said that she made a
cup of coffee and went back to bed.

. . .

[Petitioner] told law enforcement that while
Lianne was sleeping, he went to get gas sometime after
3:00 p.m. and arrived back at the house sometime around
4:00 p.m. He reported that Lianne was awake and moving
around at that time.

. . .

[Petitioner] stated that after his return:

- Lianne was "weird-acting," "spiteful,"
  "almost like a drunk but from pills,"
  "ornery," and "angry";
- She was "kind of pale," "woozy," and "a
  little bit pill-drunk";
- She was not crying but seemed "blah";
- She got a cup of coffee;
- She put on her sweats, slippers, and a
  multicolored shirt;
- She carried her boots to the front porch
  and sat in a chair;
- She refused his second request for a
  postage stamp, so he told her he was
  going to town; and
- She asked him to also pick up dog food
  for their three dogs in town.

Even though he thought she was "pill-drunk,"
[petitioner] did not check Lianne's pupils or invite
her to go with him.

[Petitioner] told the Florida detectives that he
left home a third time about 4:15 p.m. At 4:23 p.m., he
called McKinley Farms Tractor Sales, from which the

tractor had been purchased. Store employees had recently hauled the tractor back to the store for repairs. [Petitioner] spoke to salesman Roger McKinley and said, "I have a situation. I need to just sell the tractor back to you or have you sell it for me and give me $6,500."

[Petitioner] told the Florida detectives that around 4:45 p.m., he was at the post office in Bridgeport, about sixteen miles from Lianne's home, where he bought a single stamp with cash. Initially, he could not remember if a man or woman waited on him. In his second interview, [petitioner] recalled that a man waited on him and that he paid a dollar for the stamp and received change back.

[Petitioner] said that after leaving the post office, he traveled about four miles to Brookshire's grocery store, where he bought a forty-pound bag of Purina dog food for approximately forty dollars including tax. While he did not initially remember how he paid, in his second interview he remembered that a woman had waited on him and that he had paid with his debit card and received cash back. [Petitioner] stated that the post office and the grocery store were about five to ten minutes apart. The Brookshire's video shows him leaving the parking lot at 4:43 p.m.

Law enforcement did not believe that [petitioner] returned to Lianne's house after getting gas and before going to the post office in Bridgeport. Investigator Jack McGuinn of the Wise County District Attorney's Office testified there was not enough time for [petitioner] to do so, based on the time that he got gas and the time that his cell phone hit or pinged the Lake Bridgeport tower. [Petitioner] got gas at 4:01 p.m. at the Salt Creek Grocery store 9.2 miles southeast of Lianne's house. He made the call to the tractor store at 4:23 p.m.; that call pinged the Lake Bridgeport tower. McGuinn testified that it would have taken [petitioner] about twenty-three minutes to get from the Salt Creek Grocery store to a place where the call could ping that tower and thirty-six minutes to get to the same place if after leaving the store, he first drove past Lianne's house without stopping. But, Investigator McGuinn admitted that he could not pinpoint the exact location of [petitioner]'s cell phone at the time of the call. Investigator McGuinn

also explained that if [petitioner] did not return to
the house after getting gas and before going to the
post office, he never had the interactions with Lianne
in which she was "woozy," "pill-drunk," "blah," and
"weird-acting." Instead, Investigator McGuinn concluded
that [petitioner] made up this scenario to support his
suicide story.

[Petitioner] told the Florida detectives that he
arrived home about 5:25 p.m. and discovered Lianne's
body lying in the front yard. It takes about twenty-
three minutes to get to Lianne's house from
Brookshire's, so Investigator McGuinn estimated at
trial that [petitioner] would have been back at the
house around 5:15 p.m. In fact, [petitioner]'s cell
phone received a call at 5:16 p.m., and cell phone
mapping evidence indicated that he was at or very near
Lianne's house at that time.

. . .

[Petitioner] estimated that he probably left for
Florida about thirty to forty-five minutes after he
returned to Lianne's house, but he also stated that he
left at "probably 6:30 p.m." Regardless, he said that
he left for Florida while it was still daylight.

. . .

[Petitioner] told the Florida detectives that
during the time period after he found Lianne's body and
before he left for Florida he:

- cried and thought about killing himself;
- hosed down the area where he found
  Lianne's body;
- wrapped her in a comforter and plastic;
- dragged her to the garage;
- hitched a trailer to his pickup;
- loaded a Polaris Ranger utility vehicle
  and mower on the trailer and strapped
  them in;
- fed and watered the dogs;
- wrote a note to explain what had
  happened;
- left the note in his sock drawer;
- got a duffle bag out;
- retrieved the holster for his pistol;

10

- packed some clothes and several boxes of shells for his .308 rifle;
- changed the jeans and sweatshirt he wore when he discovered Lianne's body because he was going on a trip, and swapped his boots for tennis shoes;
- packed an ice chest with yogurt, mints, drinks, and other snacks; and
- put his .308 rifle in the floor board of the pickup and the pistol and its holster in the center console of his pickup (because he thought he might still kill himself).

A note drafted by [petitioner] and found under the socks in his drawer by Wise County law enforcement stated:

- the couple had been arguing for weeks;
- Lianne had been working nights;
- she was thousands of dollars behind on bills;
- [petitioner] helped her by paying several thousand dollars toward her bills;
- the previous week, Lianne told [petitioner] that she needed help dealing with her father's suicide;
- she sent [petitioner] to town for dog food and to get a postage stamp;
- [petitioner] "C[a]me Home and Lian[n]e shot Her self with [his pistol] in front Yard";
- he wrapped Lianne's body up and put it in the barn;
- he "Loaded Some of [his] Personal P[ossessions] and Titles to Take to [his] family in [Florida]";
- he did "not want to Live after finding The One [he] Love[d] shot Herself with [his pistol];" and
- Lianne was mentally unstable.

. . .

[Petitioner] told the Florida detectives that he drove to Kelly's house in Fort Myers, Florida only stopping to get gas and to make brief rest stops. He

did not remember where he stopped along the way but stated that he had carried $300, withdrawn $200 from an ATM at a gas station near Tyler, and bought gas on the trip using cash or his check card. Evidence showed that he got gas in Lindale, Texas at 9:02 p.m.

Investigator McGuinn testified that the minimum time it would take somebody to travel from Lianne's Wise County home to Lindale was three hours and fifteen minutes, which meant that [petitioner] had to have left Lianne's house by 5:45 p.m. Based on McGuinn's conclusion—borne out by the cell phone evidence— [petitioner] returned to Lianne's house from completing his errands around 5:15 p.m. McGuinn testified that [petitioner] could not have done all the things he claimed to have done during the thirty minutes he was at Lianne's home. McGuinn surmised that this was further evidence that Lianne was dead before [petitioner] even went to get gas on the afternoon of April 14, 2014.

Like Investigator McGuinn, Lee County Detective Nolan testified that he did not believe that [petitioner] could have completed all the tasks he said he did in the short amount of time that he said elapsed after he found the body and before he left for Florida.

. . .

[Petitioner] estimated that it took him twenty-three or twenty-four hours to reach Kelly's house on April 15, 2014 but admitted that it is usually a twenty-hour drive from Texas to Florida. He arrived at Kelly's home in the afternoon and told her what had happened, and she called 911 while he was in the shower. The Florida detectives arrived, and [petitioner]'s first interview with law enforcement began that evening.

. . .

[Petitioner] told law enforcement that he fled to Florida because he did not know anyone in Texas and he also wanted to heal his relationship with his sister Kelly and her husband, Charlie, by giving his rifle and ammunition to Charlie. [Petitioner] further stated that he wanted to tell his family what had happened to

Lianne in person. During Kelly's testimony, the State played a recording of a call between [petitioner] and his mother in which [petitioner] complained that Kelly had not given him time to hide the rifle he brought back from Texas before calling 911.

In his interviews with the Florida detectives, [petitioner] stated that when he arrived home and saw Lianne's body on the ground:

- she was flat;
- she was wearing her outdoor clothes;
- her legs were parted a little;
- her eyes were open;
- the bullet hole was in her neck;
- there was "so much blood on her face";
- "heavy blood" pooled by the back of her head;
- blood was "everywhere";
- "blood had gurgled out of her mouth"; and
- blood "oozed out of her mouth."

[Petitioner] further described the blood as being around the back of Lianne's neck and her neck area.

[Petitioner] told the Florida detectives that he knew that Lianne was dead and that she looked like she had been dead for fifteen to twenty minutes. He also said that she was "bluish green yellow." [Petitioner]'s sister Kelly testified that he told her Lianne's hands were "like [a] bluish-purple color."

[Petitioner] also stated in his interviews that Lianne smelled bad and "of a dead person." Upon further questioning, he clarified that it was not a rotten smell because she had not been dead several days but maybe it was the smell of blood.

Detective Nolan challenged [petitioner]'s account of finding the body, testifying that he had never seen a body dead for fifteen to thirty minutes that was bluish-green or yellow and that such a body would not yet smell of decomposition.

[Petitioner] described Lianne's hands as lying on her left upper chest. Detective Nolan and Texas Ranger Ron Pettigrew both testified that a decedent's hands

resting up near her shoulder would be inconsistent with
the previous suicides they had seen. Investigator
Reynolds testified that when he found Lianne's body in
her garage, one hand was up near her chest, but the
other hand, the right hand, was straight down her right
side.

. . .

[Petitioner] variously claimed that he found his
pistol "right by" Lianne's body, "by her hands," to the
left of her chest, "pretty close" to her neck, and on
her upper left chest area near her hands. He could not
remember how the pistol was positioned. Detective Nolan
testified that the pistol could not have landed where
[petitioner] said he found it. Ranger Pettigrew
testified that a semiautomatic, like [petitioner]'s
pistol, would usually jam after a suicide; that the
recoil of the gun and its spring going back would move
the gun down, and that a pistol being found with the
decedent's hands on their shoulder would be
inconsistent with suicide scenes that he had observed.

. . .

Investigator Reynolds and Ranger Pettigrew
testified that Lianne's purse, work materials, and
packed lunch bag were found inside her unlocked car,
"like she just stepped out of the vehicle with
everything else left inside." Ranger Pettigrew also
said that it did not appear that she had taken anything
into the house, but he admitted that he did not know if
she normally left her purse in the car.

. . .

[Petitioner] stated in his interviews with law
enforcement that after finding the body, he picked up
Lianne's hands and held them. They were limp. He
described her hands as being neither hot nor cold.
Later, he stated that she was cold, and Kelly testified
that he told her that when he grabbed Lianne's hands
they were cold.

[Petitioner] originally told the Florida
detectives that he did not think that any of her blood
got on him because he saw no blood on Lianne's hands or
her arms. In speaking with Wise County Investigator

14

Reynolds, he said that he did not remember blood being
on her hands, his hands, or the pistol. Further, even
though he told Detective Nolan that there was no blood
on Lianne's hands, he later said that he might have
cleaned her hands but never touched her face. Rather,
he offered that Lianne's dogs might have licked her
face. In contrast to [petitioner]'s story, his sister
Kelly testified that [petitioner] had told her that he
had blood on his hands from picking up the pistol.

           .  .  .

     [Petitioner] told the Florida detectives that
Lianne's puppy was near her body and in the pool of
blood when he found the body and Lianne's two older
dogs also came up to the body soon after he found it.
[Petitioner] claimed that he had nowhere to put the
dogs to keep them away from the body because he and
Lianne allowed them to go in and out of the barn at
will. He did not dispute that pens were on the
property, but he claimed they were puppy pens, not dog
pens.

     After finding the body, [petitioner] grabbed
Lianne's comforter from the couch inside the house and
rolled her up in it. He told the Florida detectives
that he did it because the dogs wanted to get "in the
mess." Later he stated that he was trying to protect
the body from the dogs. [Petitioner] explained to the
Florida detectives that blood soaked through the
comforter, and the dogs were still sniffing around it,
so he wrapped plastic sheeting from the garage around
the body. Elsewhere in the interview, [petitioner] said
that he "scooted" the body onto the comforter, he did
not remember whether he rolled the body in it, he might
have rolled the body in the plastic but did not
remember, and he "just did it." [Petitioner] said that
he did not consider what wrapping would do to the body
and did not know if the body sustained any injuries
when he rolled it up.

     [Petitioner] dragged Lianne's body by the feet
into the garage and put it beside a four-wheeled,
off-road vehicle. He stated that he left the garage
door open so the dogs could get in to eat, but he later
stated that he closed the roll-up garage door.
[Petitioner] explained that he did not move Lianne's
body into the house because her adult children would

inherit it and would be traumatized if her body were in
the house.

[Petitioner] said that after he moved Lianne's
body "out of the way," he rinsed some of the "thick,
red blood from where her head was laying" and maybe a
piece of her skull away with the water hose.

Investigator Reynolds testified that despite
[petitioner]'s statement in his interviews that the
dogs had been getting into Lianne's blood, no bloody
dog prints were found anywhere on the scene, and no
blood was found on any of the dogs.

Investigator Reynolds also testified that when he
unwrapped the body, it was wet, which is not normal,
Lianne's hair had been slicked back, and it appeared
that her face had been wiped off. She appeared to have
an injury on the right side of the top of her head
under her hair. Her clothes were stained with blood and
some other kind of liquid.

At the scene, Investigator Reynolds also located a
grassy area that tested positive for blood adjacent to
the porch, but he testified that the whole crime scene
had been sprayed with water and the blood had been
washed away. Detective Nolan testified that it is
important to see the blood pattern when investigating a
suspicious death, but it was not possible here because
[petitioner] destroyed that evidence.

. . .

[Petitioner] told the Florida detectives that he
picked up his pistol to kill himself but was afraid
that his family would think that he had also killed
Lianne. Initially, he told the Florida detectives that
he did not examine the pistol or notice how many
bullets were left in it when he picked it up. He also
stated that before he left the house, he might have
popped a different "clip" in the pistol from the gun
case inside Lianne's house but he did not remember.
When speaking with Wise County Investigator Reynolds,
however, [petitioner] stated that the pistol was ready
to fire when he grabbed it. [Petitioner] told law
enforcement that he was afraid to call 911 from the
scene because Lianne had been killed with his pistol
and because he had touched the pistol, leaving

fingerprints, when he picked it up with the intention of killing himself.

[Petitioner] told the Florida detectives that after dark on his trip to Florida, he had thrown his pistol and its holster off a bridge on Interstate 10 somewhere in Mississippi, but he did not know which body of water, could not otherwise pinpoint the location, and doubted that he could remember it. Further, [petitioner] had not called or texted anyone on the trip from Texas to Florida. He admitted that he received a call or text on the trip but stated that he had no idea where he was or whether it was received before or after he threw the pistol off the bridge. Kelly said [petitioner] told her that on his way to her home in Florida, he stopped on a bridge somewhere between Alabama and Louisiana around 2:00 a.m. and threw away the pistol.

Detective Nolan noted that [petitioner] had gestured in his interview that he had thrown the loaded pistol out the passenger window of his truck with his right hand. According to Nolan, "It just didn't make sense." [Petitioner] was unable to recall where that location was in relation to where he stopped for gas, but he could recall "little nuances that didn't mean anything" like the cost of his racing boots. Accordingly, Detective Nolan believed [petitioner] was lying.

. . .

Investigator Reynolds discovered the bullet that killed Lianne lying almost seventeen feet away from the grassy area that tested positive for blood. He testified that the location where he found the bullet would have been consistent with Lianne lying on the ground after she was shot through the throat. Reynolds again emphasized that "the whole place [had been] sprayed down with water," and no genetic material was found on the bullet.

From receipts found in the gun cabinet at Lianne's house and a recorded jailhouse call between [petitioner] and Kelly, Investigators Reynolds and McGuinn located the company from which [petitioner] had purchased his pistol and its custom barrel. They then bought identical pieces and had ballistics testing on

the bullet. Kevin Callahan, a DPS firearms and tool
mark examiner, testified that the custom barrel was
capable of firing the bullet.

[Petitioner] told the Florida detectives that he
did not look for the spent shell casing after finding
Lianne's body. Investigator Reynolds brought a metal
detector and an ATF dog to Lianne's Wise County
property to search for the shell casing. He did locate
shell casings, but not for the pistol. Ranger Pettigrew
testified that the K9 dog who searched Lianne's
property for the spent casing sat down in the grassy
area that tested positive for blood, signaling that
gunpowder had been there, but the spent shell casing
was never located.

       . . .

In addition to the missing pistol and casing, none
of the clothing [petitioner] wore at the Brookshire's
grocery store on April 14, 2014, except his hat, was
recovered by law enforcement. [Petitioner] told law
enforcement that he had changed clothes and exchanged
his boots for tennis shoes before he left for Florida,
and that those items were still in Lianne's house in
Texas. After [petitioner] was placed in jail, Lianne's
son Daniel and their family friend Ron LoFranco put all
[petitioner]'s personal items that he left at Lianne's
Wise County house in the attic, and Investigator
McGuinn had examined all of them. He testified that the
clothes and shoes [petitioner] wore April 14, 2014 were
not found. McGuinn repeatedly denied at trial that the
Brookshire's video showed that [petitioner] was wearing
boots and stated that "once [the video] was freeze
framed and blown up, it . . . looks more consistent
with tennis shoes," implying that [petitioner] killed
Lianne and changed shoes before he went to
Brookshire's. At trial, the Brookshire's video was
admitted into evidence and played for the jury, and the
jury also viewed the blown-up pictures of the video
frames.

       . . .

[Petitioner] mentioned in his interviews that
Lianne had pictures on her cell phone. Police dive
teams searched both ponds on Lianne's property, but her
cell phone was never found. After the police released

the scene, Daniel and LoFranco searched the house and
the premises for Lianne's cell phone. They found her
.357 magnum handgun in a drawer behind some clothes but
did not find her cell phone.

[Petitioner]'s mental health expert, Randall
Price, agreed that [petitioner] could have been
motivated to dispose of Lianne's cell phone if she had
taken photographs of bruises or red marks and
confronted [petitioner] with the pictures. Family
friend LoFranco testified that after he returned to
Florida from helping Daniel deal with the details of
Lianne's death in Texas, Kelly told him that
[petitioner] had thrown Lianne's cell phone in the
river along with his pistol. LoFranco reported the
information to the prosecutor about a year after
Lianne's death.

Investigator Reynolds testified that of the people
with access to Lianne's home and property, the person
who had the motive and opportunity to get rid of the
cell phone, the shell casing, and the clothes
[petitioner] was wearing when Lianne died was
[petitioner].

In addition, William Wayne Cox, [petitioner]'s
former cellmate, testified that [petitioner] told him
in the summer of 2014 that he had taken Lianne's cell
phone along with his pistol, a rifle, and a briefcase
of cash when he left Lianne's house for Florida.

. . .

The State's evidence showed a discrepancy between
[petitioner]'s documented retirement proceeds,
$32,374.36, and the amount of retirement proceeds
[petitioner] told Investigator Reynolds he received,
$29,000, which matched [petitioner]'s deposits in two
separate accounts in Texas. Investigator Reynolds
implied that [petitioner] was likely carrying the
difference in those two amounts, more than $3,000, in
the briefcase when he fled to Florida.

. . .

[Petitioner] was evasive during the interviews
with law enforcement when asked whether Lianne was
right- or left-handed. He told the Florida detectives

that he thought Lianne was ambidextrous and that he did
not pay attention to which hand she used when they shot
guns for fun. He also thought that she might write
using her right hand and he did not know which hand she
used to hold her cell phone when making calls.

When Detective Nolan asked [petitioner] if Lianne
was left-handed or right-handed, [petitioner] did not
answer the question but instead stated that "she had
both hands on the gun" when shooting targets. Detective
Nolan also said that when he asked the question,
[petitioner] grabbed hold of Nolan's hands to show him
where Lianne's hands were instead of answering the
question.

Regarding [petitioner]'s statement that he could
not remember which hand Lianne used to hold her cell
phone, Detective Nolan testified,

> These are visual observations that we make on
> a daily basis. . . . He's been in a
> relationship with her for six months. That is
> something that . . . he should know . . . .
> The way that she holds a frying p[an]. You're
> going to—if you're right-handed, you're going
> to—majority of the time gonna hold it with
> your right hand. When I'm asking if she's
> right-handed, he was unable to answer that
> question.

Detective Nolan also opined that [petitioner] should
know "how [Lianne would] hold a gun." Nolan testified
that even though [petitioner] "said at one point [that]
she did hold [the handgun] with two hands [when]
shooting into the pond, . . . he never answered if she
ever picked the . . . handgun up with the right or left
hand." Nolan further clarified that [petitioner] did
not answer which hand Lianne used to pull the trigger
when he saw her shoot targets.

In contrast to [petitioner], Lianne's children and
the medical examiner all testified that Lianne was
right-handed.

. . .

Dr. Emily Ogden, a medical examiner at the
Southwestern Institute of Forensic Sciences, performed

20

the autopsy of Lianne's body. At trial, Ogden discussed
State's Exhibit 97, which shows the entry wound on the
left side of Lianne's chin where the neck pivots and
soot around the wound.

> .  .  .

Dr. Ogden testified that the distance between the
soot and the entry wound on the body led her to
conclude that it was not a contact wound but a close-
range wound, meaning that the barrel end of the firearm
was anywhere from two to twelve inches away from
Lianne's neck when she was shot. On cross examination,
Dr. Ogden admitted that the range in this case was much
more likely to be two or three inches.

Dr. Ogden testified that nearly 100% of suicides
are classified as contact wounds. In the approximately
one hundred suicide autopsies she had performed by
[petitioner]'s trial, the only ones in which the wounds
were not contact wounds involved shotguns or "some sort
of cloth" between the skin and the weapon, producing no
soot on the body. On cross-examination, she testified
that the soot pattern around a wound is bigger the
further away the weapon is from the body. She also
testified that searing of the skin, as depicted in a
photo defense counsel showed her, occurs in a close-
range shot because the end of the muzzle is so close to
the entry. Dr. Ogden further testified that the soot
pattern on Lianne's neck, which was generally the same
size all the way around the wound, indicates that the
shot was not fired at an angle but was a fairly
straight shot.

The exit wound was on the right side of Lianne's
scalp. Dr. Ogden could not determine with any certainty
whether Lianne was lying down, sitting, or standing
when she was shot.

> .  .  .

Dr. Ogden stated that in addition to the close
range of the shot, the trajectory from left to right
also made it less likely that Lianne committed suicide
because she was right-handed. Ogden stated that it was
very uncommon for a person to use her nondominant hand
to commit suicide. A right-handed person would usually
have a right-to-left trajectory with a contact wound at

the right temple. While Dr. Ogden conceded on cross-examination that "under the chin and upward" is a method of shooting oneself and that it is plausible that the pistol was upside down when it was fired, she explained that statistically she would still expect the range to be contact or near contact so the shooter would not miss.

Dr. Ogden stated that absent [petitioner]'s story of how Lianne died, her death would have been ruled a homicide. Instead, the autopsy report classified the death as undetermined. On cross-examination, Dr. Ogden admitted that she had doubts about, and did not know, how Lianne's death occurred.

. . .

Like Dr. Ogden, Investigator Reynolds testified that Lianne's wound was not consistent with suicide because the bullet traveled from left to right, and Lianne was right-handed. He therefore testified that it was very unlikely that Lianne could have shot herself. Similarly, Ranger Pettigrew testified that he had been involved with "25 to 30" suicide investigations and that of those involving a gun, the wounds had all been "contact wounds" and he could not recall any involving a pistol shooting underneath the chin. He stated that "[g]enerally they're in the mouth or to the temple."

Detective Nolan testified that if Lianne had held a semiautomatic pistol upside down, against her body, and pulled the trigger with her thumbs—a theory espoused by the defense—there would probably be an abrasion on her hand and a black mark on, and maybe a snag of, her clothing. Investigator McGuinn likewise testified that it is easier for a person to sustain an unintended injury when shooting a semiautomatic pistol rather than a revolver if the weapon is not held properly "[b]ecause the gas from the discharge of the round being fired causes the slide to move towards the rear of the gun, therefore ejecting the shell plus seating the next round." Absent a bruise on her right buttock, no abrasions were found on Lianne's body nor was there any damage to her clothing.

. . .

Informant Cox testified that he had been in the

22

Wise County jail for sixteen months and that he had
been the cellmate of [petitioner] during part of that
time. Cox was in jail because he had five felony
charges pending. He was already on parole and had four
prior felony convictions. Because of his record, he was
facing the possibility of confinement for a period in
the range of 25 to 99 years or life. He testified that
he had not been offered any deal by the State to
testify against [petitioner] and had not asked for one,
but he was hoping to get a twenty five-year sentence.
Cox stated that he informed on [petitioner] because
"all of the important women" in his life, including his
mother, his sister, and his sister-in-law, had "been
beaten and abused" and it "just [ate] on [him] that
somebody can supposedly love somebody and then beat
them or take their life. It's just wrong."

In the summer of 2014, Informant Cox told his
retained counsel that he wanted to talk to law
enforcement about what [petitioner] had told him, and
he did so on July 2, 2014, almost a year before
[petitioner]'s trial. Cox did not tell his cellmates
why he was going to talk to law enforcement.
Ultimately, he spoke to Investigator Reynolds and
Ranger Pettigrew. Cox testified that [petitioner]
talked extensively to him about his case and that
[petitioner] also discussed his case with three other
cellmates.

. . .

[Petitioner] initially told Informant Cox that he
had been arrested for killing his girlfriend but she
had committed suicide. Later, according to Cox,
[petitioner] was "mad and was just argumentative and
just distraught" after a jailhouse telephone call with
his sister Kelly, which apparently provoked him to
relate what had happened to Lianne. [Petitioner] told
Cox that he had been arguing with his girlfriend about
money. Cox testified that [petitioner] said:

> [S]he had inherited money and . . . he didn't
> like the way that she had handled it[.] . . .
> [S]he was running the business that she
> inherited down the drain taking care of her
> kids who weren't working and wouldn't get a
> job.

23

. . . .

. . . He was tired of . . . her supporting
her two kids, specifically her son. She was
spending all her money on her son's computer,
her son's pickup, [and] her son's cell
phone[,] and [her son] wouldn't get a job and
. . . he was going back and forth to school
and not paying for any of the gas.

Informant Cox also testified that [petitioner]
told him that he had come home from the post office,
and his girlfriend had threatened to kill herself.
[Petitioner] "had just told her, 'Bitch, I'll do it for
you,' and he shot her." Another time, Cox testified,
[petitioner] said that "he had killed the whiny,
sniveling bitch and he would do it again."

Cox further said that [petitioner] told him:

- [petitioner]'s girlfriend had been "on dope" and
  was "doped up";
- the shooting occurred near Bridgeport;
- [petitioner] used his pistol;
- [petitioner] wrapped his girlfriend's body up and
  put her in a garage or barn;
- [petitioner] wrote a note stating that he was
  thinking about killing himself and that he was
  going to Florida to tell the family what happened;
- [petitioner] loaded a flatbed trailer with a
  Polaris and mower;
- [petitioner] took his girlfriend's cell phone, his
  pistol and rifle, and a briefcase of cash;
- [petitioner] left for Florida;
- [petitioner] threw the pistol into the ocean
  "because he was considering committing suicide";
- "they called and reported it" because [petitioner]
  did not think he could be convicted since he
  thought it looked like a suicide; and
- [petitioner] "had purchased a special barrel for
  [the pistol] for target practice, and he was
  afraid that the ballistics on the barrel would be
  taken and the ballistics would match the bullet."

Cox testified that [petitioner] "went back and
forth" from saying he had killed Lianne to saying that
she had committed suicide. In addition, Cox testified
that after learning that Cox had incriminated him,

24

[petitioner] threatened him through another inmate.

    .  .  .

Ranger Pettigrew testified that Informant Cox disclosed specific corroborating facts in his interview with law enforcement that he could have obtained only from [petitioner]—such as where the death occurred, where the wound was, and that the cell phone was disposed of—and facts that law enforcement did not know about before that interview—like the briefcase of cash [petitioner] took to Florida.

Investigator McGuinn testified that Cox's statement was turned over to the defense soon after he gave it, and a month later, Cox was moved out of [petitioner]'s cell. McGuinn then interviewed other inmates who had been housed with [petitioner]. Every inmate or former inmate McGuinn interviewed stated that it was possible for conversations to be held in the cell while other inmates were sleeping. McGuinn admitted that one of them, Dallas Tate, said that he never heard [petitioner] talk about his case while he was in the cell with [petitioner] and he thought Cox was lying. But, McGuinn said that Tate admitted that [petitioner] and Cox could have had conversations while Tate was asleep. Finally, McGuinn admitted that he did not interview everyone who was [petitioner]'s cellmate when a conversation between [petitioner] and Cox could have occurred.

Another inmate, Carl William Lackey, testified that he was currently in jail for a drug-related offense, he knew Cox, and Cox told him he was going to get his charges dropped by informing on someone else.

    .  .  .

Another former cellmate of [petitioner]'s, Tyler Chapman, testified that in July 2014, he was arrested for aggravated robbery, that he had pled guilty to a lesser charge, and that he was on deferred adjudication community supervision as a result of that plea. He also testified that he had not been offered anything for his testimony. Chapman knew that [petitioner] had been charged with murder because it "got talked about several times." Chapman testified that within two or three minutes of a new inmate walking into the cell,

[petitioner] "boasted out that he was in there for murder." Chapman explained that [petitioner] "said it . . . with a . . . smirk and kind of in a mocking way, kind of like he was downplaying it, like it was kind of funny," and was laughing at the time.

Chapman said that [petitioner] told him:

- [petitioner]'s girlfriend's father had committed suicide five years before her death, "and he implied that that would make it more believable that she actually would have killed herself also";
- "all that matters is that it looks like she killed herself";
- the medical report was in his favor;
- Cox would not be believed because of his extensive record and "they would think he's just trying to get off the hook with his current charge that he was in there for";
- Cox was lying in the statement against [petitioner];
- "lying is what will get you killed"; and
- Cox was lucky that he had been moved to a different cell.

. . .

With almost perfect consistency in his interviews with law enforcement, [petitioner] insisted that Lianne killed herself. Of all the witnesses, only [petitioner] indicated that Lianne was mentally unstable when she died. He described her as suffering from menopause and a hormonal imbalance. He said she was moody and could be violent—"a little time bomb" who could get "devilish mad, . . . scary mad." [Petitioner] theorized that Lianne had killed herself because of her father's suicide, her feud with her sister, her mother's disowning her before her death, and the pills that he said she took on the day of her death. [Petitioner] admitted that he did not find a suicide note from Lianne and told the Florida detectives that she never threatened to kill herself or him. Rather, he theorized that she used his gun to hurt him.

Although [petitioner] named Lianne's alleged drug

use as a factor in her death, the toxicology report completed during the autopsy indicated that Lianne had not taken any type of controlled substance and had no alcohol in her system.

Kelly joined her brother in testifying about Lianne's stressors that could have led to suicide, but Kelly also admitted that she might have told the police that she was surprised that Lianne would have killed herself because she thought Lianne was more stable than that. Kelly also said that Lianne never told her that she wanted to kill herself.

Robin White, Lianne's estranged sister, testified for the defense. Robin testified that her family had a history of depression but she did not know if Lianne suffered from depression. Robin reported that Lianne had been hospitalized in a psychiatric ward for about a week in 1979, when she was sixteen years old, because she was burning herself. Robin admitted that she had not been around Lianne for any extended length of time since 2009, but stated that Lianne had an "excitable, grandiose personality" with severe mood swings. Robin also testified, though, that Lianne had a strong personality, was physically strong, and would have fought back if attacked.

Dr. Price, a clinical and forensic psychologist, testified for the defense as an expert witness. He stated that he "did find [some] evidence of risk factors for suicide in the case of Lianne," based on his review of the evidence and an approximate ninety-minute telephone conversation with Robin. As risk factors, Dr. Price pointed to:

- Lianne's age and gender;
- her "anxiety, in the form of sleep deprivation";
- her early hospitalization for burning herself;
- [petitioner]'s report of her mood fluctuations;
- Lianne's family history of depression and suicide;
- Lianne's financial stress; and
- Lianne's relationship issues with [petitioner] and her family.

27

On cross-examination, Price testified that he never interviewed [petitioner] or Lianne's children.

Ranger Pettigrew testified that of all the people he spoke to in this case and whose interviews he reviewed, only [petitioner] described Lianne as mentally unstable, depressed or suicidal, unable to control her anger, or having abused drugs or alcohol.

. . .

The prosecution sought to portray Lianne as mentally and emotionally tough and looking forward to the future.

. . .

In a voice mail Lianne left [petitioner] six weeks before her death, she threatened to end the relationship—not kill herself—because of his controlling behavior.

Lianne's daughter Allisyn testified that she and her mother spoke every day. Allisyn described Lianne as a "determined," "independent, [and] strong woman." Lianne's close friends Vivian Lewis and Randall Mark Brown echoed Allisyn's assessment of her mother as strong.

Allisyn testified that her mother would fight for herself and walk away if there were problems in a relationship and that she would not tolerate abuse. Indeed, Lianne had left Daniel's father after he kicked her in the stomach when she was six months pregnant with Daniel. Allisyn firmly believed that her mother would have fought an attacker to the death.

. . .

Allisyn admitted that her maternal grandfather's suicide had been very traumatic for Lianne. But, Allisyn also testified that she and Lianne had discussed how neither woman would commit suicide due to the suffering their children would endure. Lianne's close friends Ron LoFranco and Vivian Lewis confirmed that Lianne had been angry about her father's suicide and had said that she would "never do [that] to [her] kids."

28

. . .

Allisyn and Lianne's friends testified that Lianne
was looking forward to the future. Nine days before her
death, on April 5, 2014, Lianne sent Allisyn, who was
eight months pregnant, a text saying, "I'm taking care
of a one-year-old baby girl, I see all the baby stuff
and think of you and I'll be there soon" and asking
Allisyn when she should come to Florida for her new
grandchild's birth. The last text Lianne sent Allisyn,
which was sent April 12, 2014, indicated that Lianne
was working an extra shift to buy her plane ticket to
Florida.

Roxanne Martin, from Azle, Texas near Lianne's
Wise County home, testified that Lianne worked an extra
overnight shift ending on April 13, 2014 at 8:00 a.m.
in Martin's home caring for her disabled son. Martin
testified that Lianne told her that she was moving to
Florida, was very happy, and "didn't appear to have any
problems that night at all."

. . .

Allisyn testified that her mother had no mental
health history, was not depressed, and was never
suicidal. However, Allisyn admitted that a defense
exhibit showed that Lianne was diagnosed with anxiety
the month before she met [petitioner] and that she had
suffered from insomnia for a long time.

Allisyn testified that financial stress was normal
for Lianne except during the nursery's busy season but
that her financial situation had improved by the time
she died. Daniel and Lianne's friends likewise
testified that Lianne's finances had stabilized.

. . .

The State's mental health expert, David Sabine, a
clinical psychologist in private practice in Wichita
Falls who also has an expertise in forensic psychology,
testified that only Lianne's age (fifty-one) provided
any risk of suicide, so she would have been at a low
risk had she been formally evaluated. He also testified
that having a family member who has committed suicide
is just one risk factor and is worth only a normal
weight. Dr. Sabine conceded that sleep deprivation

29

could be a risk factor for suicide for persons "extremely compromised" by lack of sleep. On the other hand, he also testified that a person's reducing her credit card debt and expressing hope for the future would "decrease the likelihood that the person . . . is contemplating suicide." Sabine further testified that from his review of the evidence, "[i]t appeared in the things that [Lianne] wrote that she was planning assertively and with [a] considerable amount of . . . excitement and anticipation" and that he "did not see much at all that suggested [that Lianne was] someone who would be the kind of person who would have completed suicide." Finally, Dr. Sabine said that "[t]he only suggestion of [Lianne's] instability came from [petitioner]."

. . .

The State's theory was that [petitioner] killed Lianne sometime on April 14, 2014 after she arrived home from work because she had told him to leave the night before. Kelly agreed on cross-examination that the level of animosity between her brother and Lianne was suddenly much higher on the night of April 13 and that [petitioner] would have been very upset if Lianne had told him to leave or threatened to call the police. Dr. Price buttressed the State's theory by admitting on cross-examination that Lianne's telling [petitioner] to leave or that she was going to call the police could be considered a motive for murder.

. . .

Law enforcement thought [petitioner] was lying in his interviews. Detective Nolan said that generally in his experience, "[i]t . . . throws out a flag when" a person is asked a specific question but "go[es] off on a tangent and talk[s] about something completely different, especially when they start justifying or enforcing their character and demolishing the other person's character." [Petitioner] did this repeatedly in his interviews.

For example, Nolan told the jury that in his interview of [petitioner],

- [petitioner] showed very little love for Lianne;

30

- From the way [petitioner] explained it, his relationship with Lianne was one-sided, where he provided for her but she was "just mean and rude";
- [petitioner] was trying to portray Lianne as "a ticking time bomb" with "anger issues" and "outrages of violence" and "himself as [her] white knight";
- [petitioner] described Lianne as "verbally aggressive" without indicating whether his response was aggressive;
- [petitioner]'s description of the couple's interaction the morning after their fight "didn't sound right. You have the hostile confrontation the day before, the hostile texts throughout the night where he has to call up and make sure that everything is okay between them, and then the next day she's all sweetness and like wanting to hug and kiss";
- [petitioner] did not seem upset in describing the crime scene and was "[v]ery, very descriptive of [Lianne's] injuries";
- [petitioner] did not show that he missed Lianne; and
- [petitioner] "blamed [Lianne for her death] immediately."

Similarly, Investigator Reynolds testified that while [petitioner] got emotional at times during their videotaped exchange, he shed no tears.

. . .

Ranger Pettigrew was immediately suspicious of [petitioner]'s account of what he did when he found Lianne's body. Pettigrew testified:

The actions that [petitioner] took with . . . the body, predominantly somebody came home, found somebody dead, the first thing that struck me was he never went inside to see if she was possibly killed by another person. He . . . never talked about fearing for his safety. He never called 911, if

somebody would have murdered her. He never
checked the scene. He had no self-
preservation whatsoever.

From his statement, he immediately
deduced that it was suicide and . . . set
about securing the body, wrapping up the
body, hiding it, or secreting it, washing
down the scene, taking the gun and other
evidence from the location with him as he
fled.

. . .

(Mem. Op. 9-46, doc. 17-3 (footnotes omitted).)

## II. ISSUES

Petitioner's claims are multifarious and often vague and
confusing.[3] They are construed as follows and addressed as
thoroughly as practicable in this opinion:

    (1)   the state withheld, tampered with, and destroyed
exculpatory evidence;

    (2)   the state misstated, misrepresented, and
inaccurately recounted certain evidence during the
trial proceedings and closing argument;

    (3)   the state withheld favorable exculpatory evidence
from the defense; and

    (4)   trial counsel failed to call compulsory witnesses.

(Pet. 6-7, doc. 1.)

## III. RULE 5 STATEMENT

Respondent does not allege that the petition is barred by

---

[3]To the extent petitioner asserts new facts and/or legal theories in his
reply brief, they are not considered. See *United States v. Sangs*, 31 Fed.
App'x 152, 2001 WL 1747884, at *1 (5th Cir. Dec. 11, 2001) (affirming, in §
2255 context, district court's refusal to consider issue raised for the first
time in reply to government's answer to habeas petition) (citing *United States
v. Cervantes*, 132 F.3d 1106, 1111 (5th Cir. 1998)).

successiveness, the federal statute of limitations, or a failure
to exhaust state court remedies. (Resp't's Answer 7, doc. 19.)

### IV. STANDARD OF REVIEW

A § 2254 habeas petition is governed by the heightened
standard of review provided for by the Anti-Terrorism and
Effective Death Penalty Act. 28 U.S.C. § 2254. Under the Act, a
writ of habeas corpus should be granted only if a state court
arrives at a decision that is contrary to or an unreasonable
application of clearly established federal law as determined by
the United States Supreme Court or that is based on an
unreasonable determination of the facts in light of the record
before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v.
Richter,* 562 U.S. 86, 100-01 (2011).

Additionally, the statute requires that federal courts give
great deference to a state court's factual findings. *Hill v.
Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1)
provides that a determination of a factual issue made by a state
court shall be presumed to be correct. The presumption of
correctness applies to both express and implied factual findings.
*Young v. Dretke,* 356 F.3d 616, 629 (5th Cir. 2004); *Valdez v.
Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001). Absent a
related state-court decision providing express fact findings and
the court's reasoning, a federal court may imply fact findings
consistent with the court's disposition of the claims and assume

the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied, and imply fact findings consistent with the state court's disposition. *Townsend v. Sain,* 372 U.S. 293, 314 (1963); *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir. 2003); *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002).

Finally, when the Texas Court of Criminal Appeals denies a federal claim in a state habeas-corpus application without written order, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Johnson v. Williams,* 568 U.S. 289, 298 (2013) (quoting *Richter,* 562 U.S. at 784-85). It is the petitioner's burden to rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005).

In this case, Petitioner raised his claims in his state habeas application, however no express findings of fact, conclusions of law, or written opinion were entered by the state courts. Thus, absent clear and convincing evidence, such evidence not having been presented by petitioner, this court will imply fact findings consistent with the state courts' denial of the claims and assume that the state courts applied the correct federal law as determined by the Supreme Court in adjudicating

the claims on the merits.

## V. DISCUSSION

### A. *Brady* Claims/Prosecutorial Misconduct

Under his first ground, petitioner claims that the state
withheld, tampered with, and destroyed exculpatory evidence.
(Pet. 6, doc. 1.) A petitioner's due-process rights are violated
when the state suppresses impeachment or exculpatory evidence
where the evidence is material either to guilt or punishment,
irrespective of the good faith or bad faith of the state.
*Strickler v. Greene,* 527 U.S. 263, 280 (1999); *Brady v. Maryland,*
373 U.S. 83, 87 (1963). There are three essential components of a
*Brady* prosecutorial-misconduct claim: (1) the evidence was
suppressed by the state; (2) the evidence was favorable to the
defense either because it is exculpatory or impeaching; and (3)
the evidence was material to guilt or punishment. *Strickler,* 527
U.S. at 281-82; *Brady,* 373 U.S. at 87.

Under his first ground, petitioner claims that he was denied
due process by the state's withholding of exculpatory evidence in
the form of a spent .40 caliber shell casing found at the scene
and accusing him of throwing it away at trial. (Pet'r's Mem. 1-3,
doc. 2.) He asserts that the following text message extracted
from Allisyn's phone shows that the state knew the casing was not
missing (all spelling, grammatical, and/or punctuation errors are
in the original):

> The Evidence in the phone Extraction Record
> Clearly shows the State in Bad Faith Witheld The
> exculpitory Evidence about Casing found by Barn Door,
> Clearly stated in Text Message with Time and Date.
> Phone Extraction report Pg. 218. 1-19-2015 at 12:54
> a.m. From Allisyn to Daniel Murray says in Detail: "Hey
> I forgot to tell you that we met with Prosicutor and
> Investigator, Said Trial for May They said very solid
> case. said they belief mom was already on ground when
> shot. "They Found Casing Near Barn Door". Have a voice-
> mail from mom to kris giving an ultimatum.
>
> Prosicution Knew the Casing was not missing they
> accused the Defendant several times during the Trial of
> throwing it away. There is no way the Defendent can
> obtain comparable Evidence by other Reasonable
> available Means. The Constitution Requires the
> Prosicutor to Preserve Evidence "That might be Expected
> to play a Significant Role in the Suspects Defence".

(Id. at 1.)

The record reflects that investigator Joshua Reynolds

testified that he located shell casings but not for a .40 caliber

weapon and that a shell casing for a .40 caliber weapon was never

located in the search. (Reporter's R., vol. 3 271-72, doc. 23-3;

Id., vol. 4, 38, doc. 23-4.) The record also reflects that

> [i]nvestigator Reynolds brought a metal detector and an
> ATF dog to Lianne's Wise County property to search for
> the shell casing. He did locate shell casings, but not
> for the pistol. Ranger Pettigrew testified that the K9
> dog who searched Lianne's property for the spent casing
> sat down in the grassy area that tested positive for
> blood, signaling that gunpowder had been there, but the
> spent shell casing was never located.

(Mem. Op. 27, doc. 17-3.)

Assuming that the state courts applied the *Brady* test to

petitioner's claim and deferring to the state courts' implied

finding that petitioner could not satisfy one or more of the

36

*Brady* components, the state courts' rejection of petitioner's claim is not objectively unreasonable. While the state has an affirmative duty to disclose under *Brady*, there is absolutely no evidence that a .40 caliber shell casing was ever located at the scene and was available to, or in the possession of, the state and that the state suppressed or withheld it from the defense. Petitioner's claim is conclusory, with no evidentiary basis, and such claims are insufficient to entitle a habeas petitioner to relief. *Ross v. Estelle,* 694 F.2d 1008, 1011-12 (5th Cir. 1983).

Under his second ground, petitioner claims that his right to due process was violated because the prosecutor "misstated, misrepresented [and] inaccurately recounted certain evidence" during closing argument. (Pet'r's Mem. 4, doc. 2.) More specifically, petitioner appears to complain that the prosecutor—

    (1)   misrepresented the testimony of the medical examiner by repeatedly expressing his personal theories and opinions that the evidence was not consistent with suicide;

    (2)   made an improper plea for justice by showing family photographs of the victim and expressing sympathy to the jury;

    (3)   deliberately referred to evidence—the content of text messages from Lianne's cell phone—that was destroyed;

    (4)   misled the jury by speculating about the timeline of events;

    (5)   mischaracterized a photograph of the driveway that he alleged was a view from the mailbox; and

    (6)   misled the jury that Lianne was financially secure

and that they were "one big happy family."

(Pet'r's Mem. 4-13, doc. 2.)

In federal habeas actions, improper jury argument by the state does not present a claim of constitutional magnitude unless it is so prejudicial that the petitioner's state court trial was rendered fundamentally unfair. *See Felde v. Blackburn,* 795 F.2d 400, 403 (5th Cir. 1986). Such unfairness exists only if the misconduct was persistent and pronounced or the evidence of guilt was so insubstantial that conviction would not have occurred but for the improper remarks. *See Harris v. Cockrell,* 313 F.3d 238, 245 (5th Cir. 2002). The closing argument must be analyzed in the context of the entire case to determine whether it affected the substantial rights of the accused. In making this determination, the court should consider the strength of the government's case and the trial court's instructions to the jury. *United States v. Cardenas,* 778 F.2d 1127, 1132 (5th Cir.1985); *United States v. Grubbs,* 776 F.2d 1281 (5th Cir.1985).

Under state law, proper jury argument falls within four categories: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument by opposing counsel, and (4) plea for law enforcement. *See Alejandro v. State,* 493 S.W.2d 230, 231 (Tex. Crim. App. 1973). Deferring to the state courts' implied finding that the prosecutor's comments fell within one of the four permissible categories, they do not

38

constitute error.

Petitioner asserts that the prosecutor misrepresented the testimony of the medical examiner by repeatedly expressing his personal theories and opinions that the evidence was not consistent with suicide. Petitioner directs the court to the following remarks:

> The manner in which she was killed is consistent not with suicide, not consistent with suicide. You heard that over and over again from the medical examiner, but is consistent with homicide.

(Reporter's R., vol. 8, 22, doc. 23-8.) However, it was the state's theory that Lianne did not commit suicide but was shot by petitioner. And, the medical examiner testified that if the autopsy report was based on "skewed or intentionally false" or incomplete information and/or she had had full knowledge of all the facts of the case, she believed, based on her training and experience, that the manner of death would have been ruled a homicide. (Reporter's R., vol. 4, 106-07, doc. 23-4.)

Petitioner claims that the prosecutor made an improper plea for justice by showing family photographs and expressing sympathy for Lianne and her family. (Pet'r's Mem. 4-5, 10-12, doc. 2.) However, the prosecutor's remarks about Lianne and her family as well as numerous pictures of the victim with family members were based on evidence, not merely appeals for sympathy. Nor did the remarks improperly emphasize sympathy or pity for the victim or the victim's family. Furthermore, the jury was properly

instructed that closing arguments are not evidence. (Id. at 6.)

Petitioner claims that the prosecutor deliberately referred to evidence that had been destroyed. He directs the court to the following remarks:

> You're never gonna find a text message -- a nasty text message from Lianne Murray because it wasn't there. There are text messages from other people before and after that time frame but nothing from her.
>
> . . .
>
> And so the next day she shows up, and do you really think that she went in there and gave him a hug and a kiss and said, hey, honey, how you doing? No. She says, what are you doing here? I told you to be gone or I'm gonna call the police. And it's not a stretch to think that somebody who is saying those kind of things would have taken a picture or two of the bruises that she sustained in this altercation on her cell phone, and now she has the leverage she needs to make him leave. She can call the police. She can show 'em the bruises. He could be arrested if necessary. She doesn't want that, but she's saying leave or else, so she shows him or tells him that she has this evidence against him and he needs to get out of the house.
>
> And somewhere along the line that morning between 9:00 o'clock and 9:40, I believe the only reasonable time based on all the evidence in this case, [petitioner] killed her, and he did this by shooting her through the neck.

(Id. at 26.)

Petitioner appears to mischaracterize the first remark, which the court perceives as a reference to text messages extracted from petitioner's cell phone, not Lianne's, which were introduced into evidence and available to the jury. Lianne's phone was never recovered and the information on her phone was

40

not preserved. The remaining remarks are reasonable deductions from other evidence introduced at trial.

Petitioner claims that the prosecutor "Inaccurately Recounted the Evidence of Facts also Alleged a False Time [in its power point timeline, State's Exhibit 14,] not even shown on the Document he showed on the screen to the Court and Jury." He directs the court to State's Exhibit 45. (Pet'r's Mem. 6, doc. 2; Reporter's R., vol. 10, State's Ex. 14, 20-73, doc. 23-10; Reporter's R., vol. 11, State's Ex. 45, 252, doc. 23-13.) However, the prosecutor's power point timeline was a summation of the evidence—including information communicated by petitioner and witnesses, cell phone records, business records, gas receipts, surveillance video, and minimum drive times according to day of the week, time of the day, traffic—admitted at trial and relevant to petitioner's movements leading up to the murder and afterward. (Reporter's R., vol. 3, 279-83, doc. 23-3.) The alleged inaccuracy cited by petitioner is minor and unlikely to have had a substantial effect on the jury. Nevertheless, the timeline was never admitted into evidence or allowed into the jury room.

Petitioner claims that the prosecutor mischaracterized State's Exhibit 205 as a photograph of the view from the mailbox knowing that it was no where near the mail box. (Pet'r's Mem. 7, doc. 2.) He directs the court to the following comments:

> He -- this is the view from the mailbox, and what
> do you see right there? You can't see my pointer, but

you can see right down where she's laying on the ground
according to this drawing. So he knows the mailman's
coming, right, so he leaves.

(Reporter' R., vol. 8, 27, doc. 23-8.) However, the prosecutor
does not reference a particular exhibit; thus, it is impossible
from the record to discern the photograph that was actually
referenced.

Finally, petitioner claims that the prosecutor deceived the
jury that Lianne was financially secure and that they were "one
big happy family." According to petitioner, text messages
extracted from Allisyn's phone, but withheld by the state, would
have revealed the truth. (Pet'r's Mem. 9-12, doc. 2.) However,
Alliysn's phone records were introduced into evidence and
available to the jury.

The court notes that even if one or more of the complained-
of remarks were objectionable, in light of the substantial
evidence of petitioner's guilt, the improper comments cannot be
said to have substantially prejudiced his case. In the context of
the entire trial, the comments were not sufficiently prejudicial
to violate petitioner's due process rights.

Under his third claim, petitioner claims that the state
withheld exculpatory evidence by tampering with evidence,
altering documents and reports, and failing to preserve evidence.
(Pet. 7, doc. 1.) According to petitioner, the state's
investigator, Joshua Reynolds, tampered with and altered the

crime scene; the state withheld a witness who had knowledge that the crime scene was tampered with and altered; and the state called William Cox to testify knowing that he was a liar and would provide false testify. (Pet'r's Mem. 15-19, doc. 2.)

Petitioner claims that investigator Reynolds tampered with evidence and altered documents and reports. (Id. at 15.) Specially, he asserts (all spelling, grammatical, and/or punctuation errors are in the original):

> The crime scene Tech, took Pictures showing camo sweat
> pants and Dark Blue sweatshirt with Jackson Hole Logo
> on it. Both Hanging on the handle of the Gun Safe where
> the Defendent said they were. Mr. Reynolds Tampered
> with Evidence Altered the crime scene shown in
> Defendents Exhibit #10, That they are now gone. Then
> they reapear in the States Exhibit #286 only camo
> sweatpants with things inside gun safe, his Report
> Stated all these Items found in side gun safe. In the
> States Exhibit #256 and 257 The sweatshirt with Jackson
> Hole Logo on it is shown in the Bathroom because
> Investigator new it would have gun powder residue on it
> because it was on the handle of the gun safe. Mr.
> Reynolds then authenticated a False Report stating he
> found it in the bathroom Mr. Reynolds Clearly showed
> Misconduct by Law Inforcement officer.

(Id. at 15-16.)

During Reynold's direct examination, the state offered State's Exhibits 233 through 286, to which the defense had no objection. (Reporter's R., vol. 3, 253, doc. 23-3.) Reynolds testified that at the scene he looked "for clothing that [petitioner] described to the Lee County Sheriff's Office and where it was at"; and that some clothes were recovered from a hamper in the "bathroom/laundry room area," including a

sweatshirt initially thought to be petitioner's. (Id. at 260;
Id., vol. 4, 14-15, doc. 23-4.) He testified that he saw a dark-
colored sweatshirt hanging on the gun safe but did not take that
into evidence. (Id., vol. 4, 12, doc. 23-4.) He also testified
that photographs were taken on the day of the first search and
the next day during the second search; disclosed that some of the
photographs may be from the first search and some may be from the
second search after the property was released to Daniel Murray
and Ron LoFranco; stated that he wasn't sure if the photographs
were from the initial or second search; and agreed that it was
possible that "things could change, things could be moved, things
could be taken away." (Reporter's R., vol. 3, 252-53, doc. 23-3;
Id., vol. 4, 8-9, 12, doc. 23-4.) Thus, it was possible that law
enforcement agents rearranged evidence before or after
photographs were taken or that Daniel Murray and LoFranco
rearranged evidence after the first search. Nevertheless, the
government does not have a duty to preserve the crime scene in
its original state, and petitioner fails to demonstrate how the
exact location of the sweatshirt was material or would have
altered the outcome of his trial. No DNA evidence was found on
the sweatshirt and the clothes petitioner wore the day of the
murder were never recovered. (Id., vol. 4, 9-10, doc. 23-4.)
Furthermore, the photographs were in evidence and Reynolds was
subject to cross-examination. It was the jury's role to resolve

inconsistencies in the evidence.

Petitioner claims that there were prescription medications missing from the bathroom and that the testimony of "Crime scene tech," Corey Harris, would have provided the answers to the missing exculpatory evidence. (Pet'r's Mem. 16-17, doc. 2.) Investigator Reynolds testified that he located some prescription medicine inside a drawer in the bathroom, that he took a prescription bottle of Alprazolam into evidence, photographed it (State's Exhibit 257), identified the bottle at trial, which was introduced into evidence (State's Exhibit 90), and that 19 or 20 of the pills were left in the bottle. (Reporter's R., vol. 3, 257-59, doc. 23-3.) Reynolds also testified that Lianne had been prescribed Xanax, which had been filled at CVS on July 22, 2013, and that 10 or 11 of the 30 pills had been used. (Id. at 259-60; State's Exhibit 39). Petitioner does not specify which medications were allegedly withheld from the defense or demonstrate how it was material or favorable to his defense. Mere speculation and conjecture about the potential that favorable evidence was withheld or what a witness would have testified to is not enough to demonstrate a Brady violation or prosecutorial misconduct.

Finally, petitioner claims that the state called Wayne Cox to testify knowing that he was a liar and coached him on what to say. (Pet'r's Mem. 17-18, doc. 2.) According to petitioner,

45

Reynolds knew that Cox was a liar because, when interviewed in Wise County jail, Cox told investigators that petitioner told him he got rid of Lianne's guns on the way to Florida, but they had actually been found in Lianne's residence. (Pet'r's Mem. 17, doc. 2.) However, testimony that Lianne's weapons were found in her residence and that Reynolds failed to locate the weapons in the initial search of the house was elicited at trial. (Reporter's R., vol. 3, 106-07, doc. 23-3; Id., vol. 4, 8-9, doc. 23-4.) Further, Cox was available at trial and subject to cross-examination, during which he was accused of lying and using information from petitioner to his benefit. (Reporter's R., vol. 6, 58-64, doc. 23-6; Id., vol. 7, 194, doc. 23-7.) It was the role of the jury to determine the credibility of the witnesses and the weight to be given to their testimony. *United States v. Layne,* 43 F.3d 127, 130 (5th Cir. 1995).

## B. Ineffective Assistance of Trial Counsel

Under his fourth ground, petitioner claims that he received ineffective assistance of trial counsel because counsel failed to call "Miss Alletha Chavez and Nurse Brandi B. Compulsory Witnesses." (Pet. 7, doc. 1.) Petitioner asserts that they were the last two people to see Lianna alive, beside himself, and would have been able to give the exact time she left work that morning, what she was wearing, and what kind of mood she was in when she left work. (Id.) According to petitioner, their

testimony was favorable to the defense because it would have shed light on the "severity of trouble Lianne was having at work." (Pet'r's Mem. 21, doc. 2.)

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; Evitts v. Lucey, 469 U.S. 387, 396 (1985); *Strickland v. Washington,* 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688. Both prongs of the Strickland test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. Generally, the decision whether to present a witness is considered to be essentially strategic, and such decisions by counsel are virtually unchallengeable and generally do not provide a basis for habeas-corpus relief. *See Strickland,* 466 U.S. at 689; *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985). Additionally, where, as here, the state courts adjudicated the ineffective-assistance claim on the merits, this court must review petitioner's claim under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011). In such cases, the "pivotal question" for this court is not "whether defense counsel's performance fell

47

below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter,* 562 U.S. 86, 101, 105 (2011).

Assuming the state courts applied the *Strickland* standard to petitioner's claim, and deferring to the state court's implied findings that petitioner's could not satisfy one or both prongs of the test, their rejection of the claim is not objectively unreasonable. Complaints based upon uncalled witnesses are not favored in federal habeas review because "speculations as to what these witnesses would have testified is too uncertain." *Evans v. Cockrell,* 285 F.3d 370, 377 (5th Cir. 2002); *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985). Therefore, to show the prejudice required to support an ineffective-assistance claim premised on the failure to call a witness, a petitioner must show that the witness was available and would in fact have testified at trial in a manner beneficial to the defense. *Evans,* 285 F.2d at 377. Petitioner failed to submit any affidavits or other evidence that the uncalled witnesses would have been willing to testify on his behalf and that their testimony would have been favorable. Thus, his ineffective-assistance claim based on failure to present witnesses is entirely speculative. If the only evidence of a missing witness's testimony is from the defendant, courts view with great caution claims of ineffective assistance based on failure to call that witness. *See Sayre v. Anderson,* 238

48

F.3d 631, 635 (5th Cir. 2001); *Lockhart v. McCotter,* 782 F.2d 1275, 1282 (5th Cir. 1986). Petitioner's failure to produce affidavits or similar evidentiary support from the uncalled witnesses is fatal to this claim. *Sayre,* 238 F.3d at 636 (complaint of uncalled witnesses failed where petitioner failed to present affidavits from the missing witnesses). Petitioner's conclusory statements regarding the content of the uncalled witnesses testimony are insufficient to demonstrate ineffective assistance. *See United States v. Green,* 882 F.2d 999, 1003 (5th Cir. 1989).

For the reasons discussed herein,

The court ORDERS that the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied. The court further ORDERS that a certificate of appealability be, and is hereby, denied.

SIGNED August **2 6** , 2020.

_____
JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE

49